IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Dennis A. Leverette, | ) | C/A No. 3:19-cv-00268-SAL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **OPINION & ORDER** |
| Louis Berger U.S., Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Before the court is a Motion for Summary Judgment (the "Motion") filed by Defendant Louis Berger U.S., Inc. ("Defendant"). [ECF No. 69.] Plaintiff Dennis A. Leverette ("Plaintiff") filed a response in opposition to the Motion, and Defendant filed a reply. [ECF Nos. 73, 74.] After a thorough review of the record before the court and for the reasons outlined herein, the Motion is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant seeks judgment as a matter of law in its favor on Plaintiff's retaliation claim filed pursuant to the False Claims Act ("FCA"). Interestingly, however, this action was not filed as an FCA case. For the first 10 months, it was pursued as a common law wrongful discharge case. The transformation of this case from one for wrongful discharge into one for alleged violation of the FCA is an interesting one and worth noting. Thus, before reaching the undisputed facts in the record, the court will briefly address how the case became one alleging violation of the FCA.

**A.  Procedural Background: Wrongful Discharge to FCA Violation.**

Plaintiff, an engineer, is a former employee of Defendant. He was terminated on October 17, 2016, and this action followed. He initially filed suit in the Court of Common Pleas for Sumter County, South Carolina on January 2, 2019. [ECF No. 1-1.] In the initial complaint, Plaintiff

1

asserted one cause of action related to his termination: wrongful discharge in violation of public policy. *Id.* Thereafter, Defendant removed the action to this court on the basis of diversity of citizenship. [ECF No. 1.]

Following removal, Plaintiff filed an amended complaint clarifying his claim for wrongful discharge in violation of public policy. [ECF No. 7.] Defendant moved for judgment on the pleadings on the sole claim, arguing the wrongful discharge claim is barred by an existing statutory remedy—the FCA. [ECF No. 18.] Plaintiff opposed judgment on the pleadings but also filed a motion to toll the FCA statute of limitations. [ECF Nos. 21, 24.] In the opposition to Defendant's motion, Plaintiff conceded that the "actions in the instant case do not fit squarely within the definition of a protected activity" and he has "no objectively reasonable belief[] that Defendant actually violated" or "would soon violate the FCA." [ECF No. 21 at 9–10.]

On October 16, 2019, the Honorable Terry L. Wooten declined Plaintiff's request to toll the statute of limitations on an FCA claim and allowed Plaintiff leave to amend his complaint. [ECF No. 26.] That same day, Plaintiff amended his complaint for the second time.[1] [ECF No. 27, 2d Am. Compl.] The second amended complaint removed the wrongful discharge cause of action and replaced it with a claim for retaliation in violation of the FCA, 37 U.S.C. § 3730(h). *Id.* at ¶¶ 33–41.

Defendant moved to dismiss the second amended complaint, arguing Plaintiff's representations in opposition to the prior motion for judgment on the pleadings constitute judicial admissions that Plaintiff did not have a viable FCA claim. [ECF No. 29.] Judge Wooten denied Defendant's motion by order dated April 14, 2020. [ECF No. 37.] He concluded that "there [was]

---

[1] The filing of the second amended complaint rendered the motion for judgment on the pleadings moot. [ECF No. 28.]

no intentional waiver of legal defenses" by Plaintiff; instead, "Plaintiff [] merely altered his legal conception of his claim[.]" *Id.* at 9. The case thereafter proceeded to discovery and dispositive motions as an FCA retaliation case.

### B. Factual Background.

In January 2008, Plaintiff was employed by Genesis Consulting Group, LLC ("Genesis") as a senior project manager. [ECF No. 73-2, Leverette Dep. at 31:13–17.] By July 2015, Defendant acquired Genesis, and Plaintiff, David Brandes, P.E. ("Mr. Brandes"), Carroll Barker, and Chris Salter became employees of Defendant. *Id.* at 33:5–11; 34:3–6; [ECF No. 73-3, Brandes Dep. at 19:20–25.] Plaintiff was initially assigned to Defendant's U.S. Transportation Engineering Division and worked on projects with Mr. Brandes. Brandes Dep. at 28:23–29:4; [*see also* ECF No. 69-8, Brandes Decl. at ¶ 3.] Mr. Brandes was the project manager for certain lump sum fee projects for Claro Corporation, a contractor working for Shaw Air Force Base. Brandes Decl. at ¶ 6; *see also* Leverette Dep. at 90:3–19 (referring to Brandes declaration and stating, "I generally think that it's correct.").

In the summer of 2016, Plaintiff was transferred to the Site Engineering/Power and Energy Group under the supervision of Joseph Dietrich, P.E. ("Mr. Dietrich"). [ECF No. 73-4, 30(b)(6) Dep. at 17:21–18:5.] Under the supervision of both Mr. Brandes and Mr. Dietrich, Plaintiff was required to maintain a minimum chargeability of around 80%. Leverette Dep. at 73:19–74:24; 76:11–20; 77:13–19; Brandes Dep. 29:5–17. The current lawsuit relates to Plaintiff's workload while assigned to Mr. Dietrich's team, discussions surrounding his internal timesheets, and his October 2016 termination.

1. **Plaintiff's Workload: July and August 2016.**

In the summer of 2016, Plaintiff was having difficulty finding a sufficient amount of billable work. Between July 2016 and August 2016, several emails were exchanged regarding the amount of time Plaintiff was allocating to overhead on the internal timekeeping records.

On July 15, 2016, Plaintiff writes Mr. Dietrich and Dean Hatfield, copying Mr. Brandes, stating that his "current work situation is down to [] maybe one or two hours" and he is "not aware of anything anybody has asked for." [ECF No. 62-19.] Mr. Dietrich responds on July 18, 2016, stating he does not have anything currently. *Id.* That same day, Richard Barrington ("Mr. Barrington") asks Mr. Dietrich and Mr. Hatfield about the long-term plan for Plaintiff in terms of workload. *Id.* Mr. Hatfield responds that there is "potential" for Plaintiff, but they "need a conversation to plan." *Id.* Two meetings follow the email exchange. *Id.* (notice of Skype meeting); [*see also* ECF No. 62-21 (reconvening on July 21, 2016 and noting "Dennis will have work on some local SC project").]

On August 6, 2016, and after reviewing Plaintiff's timesheets, Mr. Dietrich emails Plaintiff regarding two weeks of recorded time to proposals without project numbers. [ECF No. 62-24.] Plaintiff's timesheet allocated that time to general overhead. *Id.* Mr. Hatfield, Mr. Barrington, and Mr. Brandes are copied on the correspondence. *Id.* Mr. Dietrich informs Plaintiff that he needs to "push to get these project numbers assigned to you and then move the time on your timesheet accordingly." *Id.* Plaintiff responds that "[a]s job numbers are assigned," he will work to "get the time moved appropriately." *Id.* Plaintiff expresses no concern regarding Mr. Dietrich's request.

In the same email string, Mr. Brandes notes that he is "pushing hard to get the contracts in place . . . , but [the contracts] were delayed." [ECF No. 62-25.] He asks about assignments for

4

Plaintiff in the short term.  *Id.*  Therein, Mr. Barrington confirms (and Mr. Hatfield agrees) that in situations without contracts, they "should be filling out a work at risk form, opening a project number, and billing the project," not "burying hours in overhead."  *Id.*  Two days later, Mr. Brandes confirms he received "one that was unanticipated" and he would "be good on an assignment for [Plaintiff] for the next few weeks."  *Id.*

One week later, on August 13, 2016, Mr. Dietrich raises Plaintiff's internal timesheet as an issue again.  [ECF No. 62-26.]  Mr. Dietrich informs Plaintiff that his timesheet was rejected because it contained "site engineering overhead with the comment of project number not available."  *Id.*  Again, the issue of proper allocation of internal time is addressed.  Mr. Dietrich also informs Plaintiff that the time needs to go "on a project at risk number" or a "proposal number if it is related to business development efforts" and all previous timesheets "need to be addressed for the same issue."  *Id.*  Mr. Brandes, Mr. Hatfield, and Mr. Barrington are copied on the correspondence.

In the same email, Mr. Dietrich indicates that he understood Mr. Brandes was going to get project at risk numbers "opened based on the last email correspondence"—*i.e.*, the August 6, 2016 correspondence.  *Id.*  Mr. Brandes's response confirms that he "did not indicate that [he] was going to get any project at risk approvals;" rather, "the contracts to start were delayed."  *Id.*  He also notes that "[a] number of contracts came in late last week and [Plaintiff] will have chargeable time this week."  *Id.*  Several other emails follow.  Mr. Barrington responds that if Plaintiff is working on projects without executed contracts, that time "is not overhead."  *Id.*  Instead, Mr. Barrington notes, the project should have a project at risk number associated with it to allow the company to track the costs.  *Id.*  Mr. Barrington asks Mr. Brandes to take the "necessary steps to get in compliance."  *Id.*

5

On August 23, 2016, Plaintiff corrects his internal timesheets to include the proper job numbers, resubmits, and Mr. Dietrich provides approval. [ECF No. 62-27.] Again, Plaintiff does not challenge the request and indicates no concern about Defendant's internal recordkeeping requirements.

### 2. September 2016 Workload and Corrective Action Plan.

Moving into September 2016, Plaintiff's workload issues continue. On September 12, 2016, Mr. Brandes emails Mr. Barrington and Mr. Hatfield to let them know that while they "are actively looking for work for [Plaintiff]," his current assignments will only take him through the end of the week. [ECF No. 62-28.] After that, "he will be on overhead." *Id.* Mr. Barrington makes Mr. Dietrich aware of the workload shortage. *Id.*

During this same timeframe,[2] Defendant creates a Resource Management Review and Corrective Action Plan ("Action Plan"). [ECF No. 69-11.] The Action Plan shows Plaintiff's actual utilization at 62 and lists the "Action Planned" for Plaintiff as "Reduction in Force." *Id.*

### 3. October 2016 Emails, Alleged Protected Activity, and Termination.

Plaintiff's workload problems continue into October. On October 7, 2016, Plaintiff informs Mr. Hatfield, copying Mr. Brandes, that he has some "time at least for the short term" with "little projects at Shaw AFB for [Mr. Brandes]." [ECF No. 69-10.] Plaintiff also notes that "[a]fter these or perhaps concurrently, I'll be looking for something." *Id.* In response, Mr. Hatfield offers to assist in "obtain[ing] the charge number," if Plaintiff needs it. *Id.*

---

[2] The Action Plan was created on August 26, 2016, and modified on September 23, 2016. [ECF No. 69-11.]

The same day, Plaintiff submits his internal timesheet for approval. [ECF No. 69-14.] The timesheet again includes general overhead. The emails that follow form the crux of Plaintiff's claim of protected activity under the FCA.

On October 7, 2016, Mr. Dietrich emails Plaintiff asking if he can "put the Shaw AFB time that [Plaintiff has] on general overhead onto the Shaw AFB numbers [he] already [has] and then shift the time over to the fire equipment tasks once they are opened?" *Id.* On October 10, 2016, Plaintiff responds that "to charge the time to another project even for the same client would not be appropriate." *Id.* He explains that he ran the issue by Mr. Brandes, as the project manager on the Claro projects, and "[he] also thought that it would be inappropriate to charge the time to the other project(s)." *Id.* Plaintiff informs Mr. Dietrich that once the correct job numbers are available, he will move the hours. *Id.*

Mr. Dietrich's response to Plaintiff clarifies that "[f]rom an accounting standpoint," he believed it better to "move time between client projects as opposed to onto an overhead number then off of it onto a client number." *Id.* But Mr. Dietrich also notes that "the better solution is that job numbers [] be opened for the work being completed under a 'work at risk' authorization." *Id.* Mr. Brandes responds that not all time will be transferred, even when a project is opened, so "[s]ome of this will remain overhead." *Id.* No additional email communications followed, and Plaintiff's time was not moved from general overhead.

By mid-October, human resources begins the process of terminating 10 employees. On October 13, 2016, John Booth, Sr. Human Resources Manager, emails Thomas Nicastro and Rebeka Spires inquiring into whether there are any pending investigations or other issues related to the 10 employees slated for termination. [ECF No. 69-15.] Plaintiff is included in the list. *Id.* Ms. Spires confirms that "there are no active investigations for those listed below." *Id.*

7

On October 17, 2016, Michael L. Kirk, Senior Vice President, and John Booth inform Plaintiff of his termination. [ECF No. 69-16.]

**C. FCA Claim and Pending Motion.**

In his second amended complaint, Plaintiff alleges that his October 17, 2016 termination was in retaliation for his October 10, 2016 refusal to make changes to his internal timesheet. *See* Am. Compl. at ¶ 35 ("Mr. Dietrich's instruction to Plaintiff to change the overhead billing to a SAFB project . . . amounts to an instruction to engage in fraudulent billing to the federal government."); ¶ 36 (alleging protected activity when he opposed the request); ¶ 38 (alleging termination seven days later was retaliation). Specifically, Plaintiff alleges Defendant violated 31 U.S.C. § 3730(h), which entitles "[a]ny employee . . . to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . because of . . . other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). Plaintiff contends his refusal to change his timesheet was an effort to stop one or more violations of the FCA.

Defendant's Motion submits that Plaintiff (1) did not engage in protected activity; (2) it lacked knowledge of the alleged protected activity; and (3) Plaintiff's termination was for a legitimate, non-retaliatory reason and there is no evidence of pretext. [ECF No. 69-1.] Plaintiff opposes all three of Defendant's arguments. [ECF No. 73.] Following the submission of Defendant's reply, ECF No. 74, the court held a hearing on the Motion on December 17, 2021. [ECF No. 79.] The matter is, accordingly, ripe for resolution by the court.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In determining whether a genuine issue has been raised, the court must construe all inferences

8

and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party makes this threshold demonstration, the non-moving party may not rest upon mere allegations or denials averred in the pleading, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56; *see also Celotex Corp.*, 477 U.S. at 323.

A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A litigant is unable to "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1996).

## DISCUSSION

As noted above, Plaintiff's only claim against Defendant is one pursuant to the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h)(1). To establish the claim, Plaintiff must show: (1) he engaged in a protected activity; (2) his employer knew of the protected activity; and (3) the employer took an adverse employment action against him as a result. *See United States ex rel.*

*Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). In the Motion, Defendant argues no genuine issues of material fact exist in this case, and it is entitled to judgment as a matter of law because "Plaintiff has not and cannot establish the *prima facie* elements of a claim for retaliation under the FCA." [ECF No. 69-1 at 15.] Having thoroughly considered the parties' arguments and the applicable law, the court agrees with Defendant. The court addresses each element, in turn, below.

**I.  Element One: Protected Activity.**

The first element—protected activity—requires either (1) acts in furtherance of an FCA action or (2) other efforts to stop one or more FCA violations. 31 U.S.C. § 3730(h)(1); *see also Grant*, 912 F.3d at 200 (noting § 3730(h) includes two categories of protected activity following the 2009 and 2010 amendments to the statute); *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 170 (4th Cir. 2016) ("[T]his provision establishes two kinds of protected activity for employees of government contractors: that which supports an FCA action against the employer alleging a fraud on the government . . . and that which is part of an effort to stop a FCA violation."). Plaintiff's claim involves only the second prong of protected activity, *i.e.*, other efforts to stop one or more FCA violations. Thus, the court will focus its analysis there.

In interpreting the second prong, this court applies the "objective reasonableness standard." *Grant*, 912 F.3d at 201 (adopting objective reasonableness standard). "Under this standard, an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.* A belief is objectively reasonable when plaintiff has "facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were

designed to stop one or more violations of the FCA." *Id.* at 201–02.  And "while a plaintiff's actions need not 'lead to a viable FCA action'" to satisfy the second prong, the actions "must still have a nexus to an FCA violation." *Id.* at 202.

Defendant's argument as to the first element is two-fold.  First, Defendant argues the act at issue here is not a protected activity.  The "act" at issue is Plaintiff's refusal to transfer time on his internal timesheet—a timesheet that unquestionably does not get converted to a bill to the federal government.  Defendant notes that Plaintiff's "single email to Mr. Dietrich" on this issue—the October 10, 2016 email—fails to identify *any* wrongdoing or false or fraudulent claims.  [ECF No. 69-1 at 16–17.]  Second, Defendant submits Plaintiff has not and cannot establish that he had a reasonable belief that Defendant intended to violate the FCA.  *Id.* at 17–18.  In this regard, it is undisputed that Plaintiff's internal October time entries remained unchanged after the October 10, 2016 email.

Plaintiff responds that he engaged in protected activity because he "opposed the unlawful and unethical *billing practices* on federal projects."  [ECF No. 73 at 18 (emphasis added).]  To support this position, Plaintiff points to the August and October 2016 emails.  *Id.*  Further, Plaintiff argues that "[a]ny rationale[sic] person would have considered the action requested by Mr. Dietrich to be inappropriate and illegal and that was the very conclusion that Plaintiff made."  *Id.*

The determination of who is correct will turn on whether Plaintiff has presented the court with "facts sufficient to show that he believed [Defendant] was violating the FCA, that his belief was reasonable, that he took action based on that belief, and that his actions were designed to 'stop 1 or more violations of' the FCA."  *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 173 (4th Cir.

11

2016). The court addresses the parties' arguments in the context of the first two parts of the four-part framework identified in *Carlson*.[3]

### A. Plaintiff's Belief that Defendant was Violating the FCA.

As to the "belief" element, Defendant points to the October 2016 email and notes that it does not serve as evidence that Plaintiff believed Defendant was violating the FCA because it fails to identify any wrongdoing. The disagreement in October 2016 is simply one over internal timekeeping processes. The question being, what is the proper way to enter time for internal timekeeping purposes? Plaintiff, in response, points to the August 2016 emails in addition to the October 2016 email, arguing that both emails address continued disagreement with the internal timesheets. [ECF No. 73 at 18.]

At the outset, it is important to note the FCA violation allegedly at issue here. Plaintiff claims it is "submission of a *false claim for payment* to the federal government." [ECF No. 73 at 18 (emphasis added).] Plaintiff is correct that it is a violation of the FCA to "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval" to the federal government. 31 U.S.C. § 3729(a)(1)(A). The question then is whether Plaintiff has presented sufficient facts that he believed Defendant was going to submit a false claim *for payment* to the federal government when the discussions at issue surround an internal timekeeping question. In this regard, the court takes a close look at the emails at issue.

---

[3] The parties' arguments focus on Plaintiff's belief and the reasonableness of that belief. There does not seem to be any dispute that a refusal to change the time entry would constitute "action," at least arguably designed to stop one or more alleged violations of the FCA for purposes of the third and fourth parts of the four-part framework.

On October 7, 2016, Mr. Dietrich *asks* Plaintiff if he is able to put the general overhead time on another task. [ECF No. 69-14.] Plaintiff responds with his concern "that to charge the time to another project even for the same client would not be appropriate[.]" *Id.* Mr. Dietrich responds with his belief that moving the time between client matters is better "[f]rom an accounting standpoint" but, harkening back to the earlier emails on the same point, the "better solution is that job numbers should be opened for the work being completed under a 'work at risk' authorization." *Id.*

It is Plaintiff's position that his response to Mr. Dietrich's October 7, 2016 email was an act to prevent fraudulent billing to the federal government. However, if Defendant believed the question posed to him about moving time from overhead to an active matter was setting up a FCA violation, Defendant is correct that it is not evident from the language Plaintiff uses in the October 2016 email. The most one can gather from the exchange is that Defendant believed it would not be *appropriate* to move the time on his internal timesheet. He never uses words like illegal, false, or fraudulent. He does not express any concern over the federal government paying for the time reflected on this internal timesheet. Thus, the exchange is best described as one questioning internal timekeeping processes as opposed to "reporting or attempting to stop misconduct under the FCA." *Clinkscales v. Walgreen Co.*, No. 8:10-cv-2290, 2012 WL 80543, at *4 (D.S.C. Jan. 11, 2012).

And despite Plaintiff's contentions, the August 2016 emails similarly do not serve as sufficient evidence that Plaintiff believed Defendant was going to violate the FCA. The August 2016 emails, outlined at length above, discuss the fact that Plaintiff's internal timesheets reflect a significant amount of general overhead. Nowhere in the August 2016 emails does Plaintiff challenge the

13

internal time allocation processes outlined.  Plaintiff does not identify an alleged FCA violation. Plaintiff does not identify any wrongdoing or false or fraudulent activity or claims by Defendant. Thus, the court does not agree with Plaintiff that the August and October 2016 emails serve as evidence that Plaintiff believed Defendant was going to violate the FCA if the time on his internal timesheet was converted from general overhead to an active client file.  Again, neither the August nor the October 2016 emails "state that [Plaintiff] thought the [request] was illegal or unlawful or express any concerns about it creating the potential for fraudulent billing." *Id.*; *see also Skibo ex rel. United States v. Greer Lab'vs, Inc.*, 841 F. App'x 527, 535 (4th Cir. 2021) ("The fatal flaw in Appellants' claim is that they never allege that they raised an issue of *false or fraudulent* conduct beyond a regulatory violation that would constitute an FCA violation."); *Young v. CHS Middle E., LLC*, 611 F. App'x 130, 132–33 (4th Cir. 2015) ("[P]rotected activities exclude 'those in which an employee . . . just imagines fraud but lacks proof.'") (citations omitted).  Without sufficient evidence on this element, Plaintiff cannot survive summary judgment.

### B. Objective Reasonableness of the Belief.

But even if Plaintiff presented sufficient facts of his alleged belief that Defendant was violating the FCA, he must also show that his belief was objectively reasonable.  Plaintiff points to his own deposition testimony that "[a]ny rationale[sic] person would have considered the action requested by Mr. Dietrich to be inappropriate and illegal and that was the very conclusion Plaintiff made." [ECF No. 73 at 18.]  The court disagrees and finds Plaintiff has failed to show that his belief that Defendant intended to violate the FCA was objectively reasonable.

Plaintiff's evidence that Defendant was preparing to violate the FCA is limited to the email exchanges regarding the amount of time Plaintiff was allocating to general overhead on his internal

14

time sheet, and Mr. Dietrich's subsequent inquiry into whether Plaintiff could temporarily move the time to an active matter. As Defendant has continually noted, the request to move time was for <u>internal</u> accounting purposes only. Because the Claro projects were lump-sum payment projects, there was never any possibility that the time on Plaintiff's timesheet would have been billed to the federal government. *See* Brandes Decl. at ¶¶ 6–10; Dietrich Decl. at ¶¶ 7–9. This fact is clearly stated in Mr. Brandes's declaration—a declaration Plaintiff testified was correct. [ECF No. 69-3, Pl.'s Dep. at 88:2–89:2.] Thus, the court must conclude that these facts are undisputed: (1) Claro projects were lump-sum projects and (2) Plaintiff's internal timesheet entries would not have served as time "billed" to Claro.

Asking an employee to move time for internal timekeeping purposes does not "state[] a theory of fraud on the government." *Carlson*, 657 F. App'x at 173. Stated simply, the court cannot say that the evidence submitted by Plaintiff is "enough to make his alleged belief in [Defendant's] fraud objectively reasonable—in fact, it is entirely speculative." *Id.*; *see also United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 621 (E.D. Va. 2016) (looking to an employee's good faith belief that an employer was engaging in unlawful conduct in light of whether "a reasonable employee in the same circumstances would believe, that the employer is committing fraud against the Government"). For these reasons, the court finds that Plaintiff has not presented sufficient facts of a protected activity to survive summary judgment on the retaliation claim.

## II. Element Two: Defendant's Knowledge of a Protected Activity.

Even if Plaintiff presented sufficient facts of his "belief" and the existence of a protected activity, the court also finds that Plaintiff failed to present sufficient facts of the second element, Defendant's knowledge of the "protected activity." As to the second element, Defendant again

argues that the October 2016 email does not refer to any allegations of fraudulent conduct against the government. [ECF No. 69-1 at 18–20.] Plaintiff responds that Defendant was on notice of his "protected activity" as early as August 2016. [ECF No. 73 at 18–19.] The court agrees with Defendant.

For the second element of a prima facie retaliation claim, a plaintiff must show that the employer had notice of the protected activity. The notice prong is "appropriately viewed from 'the employer's perspective' and turns on whether 'the employer is aware of the employee's conduct.'" *United States ex rel. Parks v. Alpharma Inc.*, 493 F. App'x 380, 388 (4th Cir. 2012) (citing *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010)). "This element is met when the employee's words and acts are 'sufficiently suggestive of fraud or falsity' such that the employer knew or should have known that the FCA litigation was a reasonable possibility." *United States ex rel. Potter v. CASA de Md.*, No. 16-0475, 2018 WL 1183659, at *8 (D. Md. Mar. 6, 2018) "Statements by an employee 'clearly couched in *terms of concerns* and suggestions, not threats or warnings of FCA litigation' do not constitute notice as required to make out an FCA retaliation claim." *Id.* (citing *Parks*, 493 F. App'x at 389–90) (emphasis added).

There is no question that Plaintiff's statement in the October 2016 email is one of concern. In fact, Plaintiff uses the word "concerned" in explaining his position to Mr. Dietrich.[4] He states: "I

---

[4] The court also notes that there is no evidence that Mr. Dietrich was involved in the decision to terminate Plaintiff. *See Clinkscales*, 2012 WL 80543, at *5 n.3 (noting assistant store managers were informed of alleged illegal conduct, but there was no evidence that the person who imposed the discipline on the plaintiff knew about the alleged protected activities). While Plaintiff points to the Rule 30(b)(6) deposition testimony providing that Neil Weitman was leading the Action Plan effort and "would have been speaking with . . . the practice leaders" and the fact that Mr. Dietrich was Plaintiff's practice leader, that same testimony provides only that "there would have been a practice leader that they *may have* discussed with." [ECF No. 73-4, 30(b)(6) Dep. 51:22–52:3 (emphasis added).] The 30(b)(6) deponent did not testify that Mr. Weitman discussed the Action Plan with Mr. Dietrich. If the individuals who terminated Plaintiff were "unaware of such

16

was *concerned* that to charge the time to another project even for the same client would not be appropriate[.]" [ECF No. 69-14 (emphasis added).] However, nothing in this statement "shows that anyone . . . would have reasonably believed that [he] was contemplating or acting in furtherance of an FCA action." *Parks*, 493 F. App'x at 389.

As for the August 2016 emails, they are unavailing for the same reasons outlined in Section I, *supra*. There is not a single mention of anyone asking Plaintiff to move time to an active project file. The discussions solely surround the proper process of opening a work at risk file over charging time to overhead. Therefore, Plaintiff has not presented the court with sufficient evidence of the notice prong of his FCA retaliation claim to survive summary judgment.

### III. Element Three: Termination and "But-For" Causation.

The final element of an FCA retaliation claim is an adverse employment action as a result of the protected activity. *See Grant*, 912 F.3d at 200. Plaintiff, again, has not met his burden to survive summary judgment on this element.

Plaintiff was terminated on October 17, 2016. That fact is not in dispute. Defendant contends that even if Plaintiff established a prima facie case of retaliation under the FCA (and he has not), it has met its burden of showing a legitimate non-retaliatory basis for the termination (reduction in force), shifting the burden back to Plaintiff to pretext. Because Plaintiff has not presented sufficient evidence of pretext, Defendant submits it is entitled to judgment as a matter of law for this additional reason. In response, Plaintiff argues that while the Action Plan evidencing a reduction in force was created before the October 2016 email exchange, it was not finalized until sometime later, "closer in time to Plaintiff's actual discharge." [ECF No. 73 at 19; *see also* 24

---

[protected] activity," this court cannot find that they retaliated against Plaintiff for his alleged protected activity. *Clinkscales*, 2012 WL 80543, at *5 n.3

("The existence of the RIF plan . . . did not even come into existence until after Plaintiff's initial protected activity.").] In making this argument, Plaintiff relies on the August 2016 emails as "protected activity," the finalization of the Action Plan sometime after September 21, 2016, and the October 2016 "protected activity, and the termination one week later. *Id.* at 24–25. The court finds Plaintiff's arguments unavailing.

In assessing the third element, courts in this District apply the Title VII burden-shifting framework. *See Clinkscales*, 2012 WL 80543, at *5; *see also United States ex rel. Cody v. ManTech Int'l Corp.*, 746 F. App'x 166, 177 (4th Cir. 2018). Pursuant to the framework, once a plaintiff establishes a prima face case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII case). If a defendant demonstrates a legitimate, nondiscriminatory reason, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason is not the true reason, but was a pretext for discrimination. *See id.*

Here, even if Plaintiff gets the benefit of the presumption of retaliation, Defendant has unquestionably established a legitimate, nondiscriminatory reason for Plaintiff's termination. Before Mr. Dietrich's October 7, 2016 request for Plaintiff to make a change to his internal timesheet, Defendant's Action Plan was in place. The plan for Plaintiff being "Reduction in Force." [ECF No. 69-11]; *see also Cody*, 746 F. App'x at 182 (affirming jury question existed in the *absence of* "corroboration . . . such as internal documents reflecting that such a decision had, in fact, been made"). Further, Mr. Brandes and Mr. Dietrich submitted declarations about Plaintiff's difficulties obtaining billable work. Mr. Brandes states that "[a]s early as July 2016, [Plaintiff] was having difficulty finding billable work to perform within his area of expertise."

18

Brandes Decl. at ¶ 5. Mr. Dietrich confirms that "[t]hroughout his time within my work group, [Plaintiff] appeared to have difficulty finding billable work to perform within his area of expertise." Dietrich Decl. at ¶ 5. It was his "recollection that [Plaintiff's] lack of productivity had been an issue prior to this reorganization as well." *Id.* "As a result of his underutilization, [his] continued employment was at risk." *Id.* at ¶ 6.

Plaintiff's own emails and deposition testimony confirm his lack of billable work. From July 2016 to October 2016, there are several emails exchanged regarding Plaintiff's time on overhead, his need for new projects, and his efforts to find additional work. And in Plaintiff's deposition, he confirms that Mr. Brandes's declaration is "correct." Leverette Dep. at 90:3–19. Therefore, the court is left with only one conclusion: Defendant has met its burden of establishing that Plaintiff was terminated for a legitimate, nondiscriminatory reason and that reason.

To survive summary judgment, Plaintiff must present the court with evidence of pretext. He has not. The timeline presented by Plaintiff, which relies heavily on the unavailing August 2016 emails, is not "evidence form which a reasonable jury could conclude that the reasons relied on by [Defendant] in making the decision to [terminate Plaintiff] were false, or were in any way pretextual." *Clinkscales*, 2012 WL 80543, at *7. For this additional reason, Defendant is entitled to summary judgment on Plaintiff's FCA retaliation claim.

## CONCLUSION

This case was not filed as an FCA retaliation case, and the analysis above explains why. While there was a disagreement between Plaintiff and Mr. Dietrich regarding the "appropriate" way to record time for *internal* timekeeping purposes, the undisputed facts evidence that Plaintiff's response to the disagreement is simply not one protected by the FCA's retaliation provision. For

the foregoing reasons, Defendant Louis Berger U.S., Inc's Motion for Summary Judgment, ECF No. 69, is **GRANTED**.

    **IT IS SO ORDERED.**

/s/ Sherri A. Lydon_____
United States District Judge

January 5, 2022
Florence, South Carolina

20